IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

WILLIAM S. TERRY,

       Plaintiff,

   v.                               **Case No. 2:09-CV-624**
                                         **MAGISTRATE JUDGE KING**

UNITED STATES ENRICHMENT
CORP., *et al.,*

       Defendants.

## OPINION AND ORDER

This matter is before the Court, with consent of the parties pursuant to 28 U.S.C. §

636(c), for consideration of Plaintiff's *Motion for Additional Time to Obtain Evidence, to*

*Compel Discovery, and for Judgment on the Basis of Spoliation of Evidence*, Doc. No. 28

[hereinafter "*Plaintiff's Motion*"].  For the reasons that follow, the motion is granted in part and

denied in part.

### I.

Plaintiff William S. Terry ["Plaintiff"] claims that he was unlawfully terminated from

employment at the Defendants' plant, located in Pike County, Ohio, on account of his age.

Defendants are United States Enrichment Corporation and USEC, Inc.   Plaintiff asserts claims

of age discrimination under the Age Discrimination in Employment Act ["ADEA"], 29 U.S.C. §

621, *et seq.*, and Ohio law, R.C. § 4112.14; negligent and intentional infliction of emotional

distress; breach of employment contract; and violation of public policy.  The Court has

jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

Plaintiff was employed at the Defendants' plant from approximately August 1974 until his employment was terminated on July 15, 2005. *Deposition of William Terry* [hereinafter "*Plaintiff's Depo.*"], at 7. Although he worked in different capacities at the plant, from 1993 until his termination Plaintiff worked as a laboratory technician in the Applied Nuclear Technology Department. *Id.,* at 7-11.

In this capacity, Plaintiff's job required, *inter alia*, measuring the "assay"[1] of cylinders of uranium hexafluoride. *Id.* In order to obtain the measurement, a "Moblie Enrichment Meter" ["MEM"] unit was utilized.[2] The assigned lab technician must perform five steps in order to obtain the measurement: (1) create a database for each cylinder to be measured; (2) perform an initial quality control measurement using a known "standard;" (3) engage the measurement unit for a minimum period of time to ensure accurate reading; (4) observe the meter in operation to assure that sufficient voltage is reaching the unit; and (5) provide a final quality control check using another known standard after the cylinder at issue is measured. *See* Exhibit C at §§ 8.4-8.8; *Plaintiff's Depo.*, at 24-28.

On deposition, Plaintiff testified that he used the MEM unit on a daily basis for approximately seven years. *Plaintiff's Depo.,* at 15-16. He was familiar with the MEM procedure and understood how to apply it. *Id.* From September 2004 to May 2005, however, no cylinders were received at Defendants' plant; the MEM unit sat idle during that period of time. *Deposition of Dewey Cordle,* at 113[hereinafter "*Cordle Depo.*"]; *Deposition of Johnny Rexroad,* at 24.

---

[1]"Assay" in this context refers to the U-235 isotopic content.

[2]The MEM unit is comprised of several component parts, including a laptop computer. *See MEM Procedure*, attached as Exhibit C to *Defendants' Motion for Summary Judgment*, Doc. Nos. 24 and 25.

2

It is Defendants' contention that, on June 27, 2005, Plaintiff fabricated the measurement results of a cylinder.  It is undisputed that, as Plaintiff utilized the MEM unit on this date, it "crashed," *i.e.*,  the high voltage input necessary to obtain the measurement failed.  *Plaintiff's Depo.*, at 38, 45.  However, according to Plaintiff, the computer registered a reading prior to the failure, which Plaintiff transcribed on the required form.  *Id.* at 38, 44, 47.  Plaintiff reported that reading to Dewey Cordle, his supervisor.  *Id.* at 47-48.   Plaintiff testified on deposition that he "couldn't get the system back up so I reported it- [t]old the supervisors that the high voltage - [h]ad problems with it, but I did get a result."  *Plaintiff's Depo.,* at 38.  Plaintiff disputes Defendants' contention that he "fabricated" the measurement result.  *Id.,* at 65.

Cordle reviewed the reported result and concluded that Plaintiff had "made up" the reading.  *Cordle Depo.*, at 73.  Cordle reached this conclusion because there was no database file created to achieve the reading; the "spectra" file was "flat" and no quality control checks had been performed.  *Id.,* at 54, 58, 60, 65-68, 70, 72-76.  On deposition, Plaintiff could not recall whether a database had been created or whether the spectra achieved a measurement.  *Plaintiff's Depo.*, at 49-50, 52-53.

Plaintiff was questioned about the result and was given two weeks off work while the matter was investigated.  *Id.*, at 54-55, 59-60.  That investigation was conducted by Kim Lassiter, Director of Human Resources. *Deposition of Kim Lassiter,* at 8, 25.  Lassiter questioned Plaintiff's managers and supervisors and consulted "subject matter experts."  *Id.* at 26, 30.  According to Lassiter, even if the MEM unit had not been working properly, it would not have produced a reading such as the one reported by Plaintiff.  *Id.,* at 26-27.  In Lassiter's view, "[Plaintiff] attempted to take a reading, got no reading, which would have meant he would have

had to run the test all over again, and . . . rather than run the test over again, [Plaintiff] falsified the conclusions." *Id.,* at 28.  Plaintiff's employment was terminated following the two-week investigation based upon his alleged "failure to report when there was a problem with the instrument" and falsification of test results.  *Id.,* at 33, 37, 44, 61.

Plaintiff points out that the MEM unit was the only one at the plant and was actually comprised of two original MEM machines built by Defendants.  *See Deposition of Richard Mayer*, at 20.  Richard Mayer, a former engineer for Defendants, testified on deposition that the MEM unit was experiencing a problem with the "high voltage multichannel analyzer" at the time Plaintiff was terminated.  *Id.*, at 24.  According to Mayer, just before Plaintiff used the machine, technicians tried to fix it and "clean things up as best [we] could" but the unit would "occasionally . . still kick out . . . ." *Id.,* at 24-25.  Mayer also testified that, "[i]mmediately" after Plaintiff's termination, the unit continued to experience a "high voltage kicking out at least once [a day]." *Id.*, at 25.  Within "a couple weeks," it was determined that a new high voltage analyzer was necessary.  *Id.*, at 25-26.

At the time of his termination, Plaintiff had been the only person responsible for operating the MEM system at Defendants' plant.  *Plaintiff's Depo.,* at 18.  On deposition, Cordle testified that, from 1999-2005, Plaintiff logged nearly every reading obtained using the MEM unit.  *Cordle Depo.*, at 26-27.  Plaintiff alleges that, following his termination, he was replaced by a younger, lower salaried, employee.  Plaintiff was forty-nine (49) years old at the time of his termination and had worked twenty-eight (28) years for Defendants.  Plaintiff would have qualified for early retirement had he worked for an additional four months, to age fifty (50).  Had Plaintiff worked until age fifty-three (53), he would have been entitled to immediate payment of

pension benefits.  *Deposition of Debra Brown*, at 11-12, 31.  According to Plaintiff, his termination "saved [Defendants] $168,480 in pension benefits that [he] would have been eligible to receive between the ages of 53 to 65."  *Plaintiff's Memorandum contra*, Doc. No. 27, at 13.

Defendants have filed a *Motion for Summary Judgment* on Plaintiff's claims.  Doc. Nos. 24 and 25.  Plaintiff has filed a memorandum in opposition to the motion but also moves separately to compel additional discovery in this case.  Before considering the merits of Defendants' motion, the Court addresses *Plaintiff's Motion* regarding discovery.

## II.

### A.  Plaintiff's Motion for Additional Time to Obtain Evidence and to Compel Discovery

Plaintiff seeks additional discovery in order to further respond to Defendants' *Motion for Summary Judgment*.  Rule 56(d) of the Federal Rules of Civil Procedure establishes the procedure to be followed when a party concludes that additional discovery is necessary to respond to a motion for summary judgment:

> **When Affidavits are Unavailable.**  If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).  The rule requires "that a party making such a filing indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information."  *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000), citing *Radich v. Goode*, 886 F.2d 1391, 1393-94 (3rd Cir. 1989).  In this case, Plaintiff has clearly identified the discovery that he believes is necessary to further respond to

Defendants' *Motion for Summary Judgment*. The Court will therefore continue the analysis for each category of discovery.

**1. Plaintiff's Annual Employee Reviews**

Plaintiff moves to compel the production of Plaintiff's annual reviews. It is undisputed that these records were destroyed by Defendants as part of an established document retention policy. *Defendants' Memorandum contra*, Doc. No. 32, at 6, citing *Deposition of Anita McGinnis*, at 20-21, 50. Plaintiff concedes that the employee reviews are unavailable but argues that they were destroyed "with a view of defeating Plaintiff's claims." *Plaintiff's Motion*, at 3. Under these circumstances, Plaintiff argues that Defendants should be held accountable for spoliation of this evidence. Defendants take the position that the reviews are not relevant to any issue in the case.

Plaintiff argues that his performance reviews, which Plaintiff characterizes as positive, are relevant to the issue of pretext:

> Had Terry been given any <u>un</u>favorable performance reviews, USEC would have labeled the records as Exhibit "A" in support of its claim the termination was non-discriminatory. Such records are commonly presented in wrongful discharge cases on behalf of employers . . . . It is logical that, if evidence of poor performance evaluations are relevant to whether there is a non-discriminatory basis to discharge an employee, then a 28 year history of positive performance evaluations with no evidence of any falsification of documents would similarly be relevant to expose the employer's stated reason for a termination was only a pretext to discrimination.

*Plaintiff's Reply,* Doc. No. 36, at 5 (emphasis in original). Plaintiff's reasoning in this regard is flawed. Defendants do not base Plaintiff's termination on poor performance reviews; they base their action on a single event, *i.e.*, Plaintiff's alleged falsification of the MEM measurement.

Even accepting Plaintiff's claim of positive performance reviews, evidence of those reviews would not address whether Defendants' articulated basis for the termination of Plaintiff's employment was mere pretext for unlawful discrimination.  Because Plaintiff's performance reviews are not material to the resolution of Defendants' *Motion for Summary Judgment*, *Plaintiff's Motion* is without merit as it relates to those documents.

### 2. Repair and Maintenance Records for the MEM

Plaintiff also seeks to compel production of records regarding repairs to the MEM unit. Keith Wines, one of Defendants' engineers, testified on deposition that an "electronic maintenance tracker" should have been generated each time the MEM malfunctioned. *Deposition of Keith Wines,* at 34-35.  According to Wines, such a tracker should have included an e-mail reporting the problem and a response from an engineer addressing the problem.

Defendants represent that they have produced "each and every repair and/or maintenance record in [their] possession concerning the MEM's machine. . . ." *Defendants' Memorandum contra*, at 7.  Furthermore, Defendants represent that they are "prepared to stipulate that the MEM malfunctioned on a regular basis up to and including the period of time in 2005 when Terry was terminated." *Id.*   Plaintiff argues that, if additional evidence regarding repairs to the MEM cannot be produced, Defendants should be held accountable for spoliation of this evidence.

It is unclear to this Court whether these records exist.  Plaintiff acknowledges that Defendants "provided some records confirming the quality control (QA/QC) tests that were run on the MEM before and after an actual cylinder was tested." *Plaintiff's Reply Memorandum*, at 7.  Plaintiff maintains, however, that Defendants have not produced "the maintenance records

that would have been created each time the MEM malfunctioned and required service on a daily basis around the time [Plaintiff] was fired." *Id.*  According to Pamela Sprouse, who was designated as Defendants' deposition representative, such information could be in the "raw data package." *Deposition of Pamela Jo Sprouse,* at 27, attached as Exhibit to Plaintiff's *Notice of Filing,* Doc. No. 31.  Moreover, the raw data package could be archived, *i.e.*, "sent off to storage . . . there's a retention time for quality records." *Id.*  Sprouse testified that, prior to her deposition, she asked to review the "raw data" but was told by one of Defendants' engineers that "they did not believe they could get the entire data package." *Id.*, at 49.  Sprouse "did not push [the issue]." *Id.*  Plaintiff argues that the existence of "raw data" as to the functioning of the MEM around the time of his termination is relevant to the issue of pretext for actual discrimination – *i.e.,* that the MEM could have produced the result reported by him –  and that Defendants' failure to preserve this information should be sanctioned..

Defendants argue that, because they are willing to stipulate that the MEM malfunctioned on nearly a daily basis around the time of Plaintiff's termination, evidence of any "raw data" as to the functioning of the MEM is unnecessary.   Defendants also contend that, in light of their defense based on the "honest belief" rule, *see Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998), the information sought by Plaintiff in this regard is irrelevant.

Under the "honest belief" rule, an employer can prevail, even when the plaintiff has demonstrated a *prima facie* case of discrimination, if the employer can demonstrate that the adverse employment action was based on the employer's "reasonable reliance" on the particularized facts that were before it at the time the decision was made.  "The key inquiry is whether the employer made a reasonably informed and considered decision before taking an

adverse employment action." *Id.*, at 807. This is true, moreover, even if the facts upon which the employer relied are ultimately proven to be incorrect. However, if "the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held." *Id.,* 807-08. *See also Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir. 2008)(applying the "honest belief" rule in an action under the ADEA).

In the Court's view, the information sought by Plaintiff in this regard is relevant to both Defendants' assertion that Plaintiff fabricated the reading and to the adequacy of Defendants' investigation of the facts. Moreover, Defendants' offer to stipulate to the general "malfunctioning" of the MEM does not assist Plaintiff in addressing these issues. Plaintiff is therefore entitled to an opportunity to discover this information.

As noted *supra*, however, it is not clear whether the "raw data" exists. If it is possible to retrieve records relating to the raw data from the time period around Plaintiff's termination, the Court concludes that production of those records is warranted. Thus, the Court **DIRECTS** Defendants to make further inquiry as to the existence of such "raw data" and to produce those documents if they exist.

### 3. Expert Testimony by Defendants' Representative

Finally, Plaintiff moves to compel the deposition of "a person most knowledgeable about the MEM machine . . . to explain in detail the working of the machine and the software contained

within it." *Plaintiff's Motion*, at 6. Defendants identified Pamela Sprouse in this regard but, at her deposition, Sprouse denied that she was an expert on software for the MEM. *Id.; see also Sprouse Depo.,* at 30, 58. Defendants note that Plaintiff has deposed ten current or former employees, "at least five of whom offered substantial testimony regarding the design and operation of the [MEM]." *Defendants' Memorandum contra,* at 8. Specifically, Plaintiff deposed Richard Mayer, the original design engineer of the MEM and author of its software, and Keith Wines, an engineer with knowledge of the MEM. In addition, Plaintiff deposed Dewey Cordle, Plaintiff's supervisor, who is also an engineer trained to operate the MEM.

Although Pamela Spouse may not be an expert on the software relating to the MEM, it appears to the Court that Plaintiff has actually deposed those individuals with the most knowledge on this subject. Thus, the Court declines to compel additional discovery as to the third category of evidence sought by Plaintiff.

**B. Plaintiff's Motion for Judgment on the Basis of Spoliation of Evidence**

Plaintiff also asks that, if Defendants cannot produce the requested information, the Court "grant judgment on the issue of [Defendants'] liability due to spoliation of evidence." *Plaintiff's Motion*, at 7.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2nd Cir. 1999) (citation omitted). In *Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009), the United States Court of Appeals for the Sixth Circuit held that "the authority to impose sanctions for spoliated evidence arises not from substantive law but, rather, 'from a court's inherent power to control the judicial process.'" *Id.* at

10

652, quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4ᵗʰ Cir. 2001).  Thus, a district court may impose "many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence."  *Id.*, citing *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4ᵗʰ Cir. 1995).

The Court has concluded that records of Plaintiff's annual employee reviews are not relevant to the issue of whether Plaintiff's employment was terminated on account of his age.  Thus, in the Court's view, the fact that these records have not been preserved by Defendants does not amount to spoliation of evidence and does not warrant the imposition of sanctions.

With respect to records relating to the repair and maintenance of the MEM, it is not clear to the Court whether such records exist; Ms. Sprouse was apparently advised that these records may be archived.  Unless and until Plaintiff can establish, at a minimum, that the requested records do not in fact exist, his  request for judgment based on alleged spoliation is not warranted.

### III.

**WHEREUPON**, Plaintiff's *Motion for Additional Time to Obtain Evidence, to Compel Discovery, and for Judgment on the basis of Spoliation of Evidence*, **Doc. No. 28**, is **GRANTED in part** and **DENIED in part**, consistent with the foregoing.

Defendants are hereby **ORDERED** to determine whether "raw data" relating to repair and maintenance of the MEM exist and, if so, immediately produce those records to Plaintiff.  Plaintiff may have twenty-one (21) days to file a supplemental response in opposition to the

*Motion for Summary Judgment*.  Defendants may file a reply to Plaintiff's supplemental response

within fourteen (14) days.


          **IT IS SO ORDERED.**


**April 5, 2011**                          *  s/ Norah McCann King   *
**DATE**                                     **NORAH McCANN KING**
                                            **UNITED STATES MAGISTRATE JUDGE**